ORDERED.

Dated:  **March 10, 2020**

Michael G. Williamson
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                                       Case No. 8:17-bk-07782-MGW
                                                             Chapter 11
SRQ Taxi Management, LLC

      Debtor.
_____/

SRQ Taxi Management, LLC,                                    Adv. No. 8:18-ap-00013-MGW

      Plaintiff,

v.

Sarasota Manatee Airport Authority,

      Defendant.
_____/

### **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This case brings to mind the old adage, "If you can't beat 'em, join 'em." In

2015, the Sarasota Manatee Airport Authority, which operates the Bradenton-

Sarasota International Airport, was confronted with the inevitability of

Transportation Network Companies (or TNCs) such as Uber and Lyft operating at the Airport. Passengers were demanding access to TNCs. But TNCs were causing problems for the Airport (and other airports around the country) by cutting into the Airport's parking and rental car concessions—the two biggest drivers of non-aeronautical revenue for the Airport.

So the Airport Authority found a way to mitigate those losses and maximize its revenues: It entered into operating agreements with Uber and Lyft that charged the TNCs $2.50 per pick-up; gave Uber and Lyft six reserved parking spots in the prime row in the Airport's short-term parking area, which sits roughly 150 steps in front of the Airport terminal; and installed signage (inside and outside the terminal) steering passengers to the Uber/Lyft reserved parking spots. Since then, Uber and Lyft have seen their share of the pick-ups at the Airport increase from roughly 25% to nearly 90%, generating anywhere from $10,000 to $20,000 per month in additional revenue to the Airport.

But SRQ Taxi, which (along with its predecessor in interest) has been the exclusive on-demand, for-hire ground transportation operator at the airport for more than three decades, has seen its share of pick-ups plummet from 75% to less than 10%. Worse, SRQ Taxi is contractually obligated to pay the Airport Authority for each deplaning passenger, regardless of whether it gets 75% of the pick-ups or less than 10% of the pick-ups. SRQ Taxi asks this Court to determine that the Airport Authority's arrangement with Uber and Lyft—which the Airport Authority has

referred to as the "red carpet" treatment—violates SRQ Taxi's rights under a Concession Agreement.

The Concession Agreement grants SRQ Taxi the right to operate a taxi and limo service at the Airport. Although Article 4.1 of the Concession Agreement refers to that right as *non-exclusive*, Article 4.3 goes on to limit the other ground transportation that may be permitted at the airport to either not-for-hire or prearranged transportation. Thus, reading the Concession Agreement as a whole, SRQ Taxi has the exclusive right to provide on-demand, for-hire transportation.

By providing TNCs signage and six reserved parking spots in the short-term parking area, the Airport Authority has allowed to TNCs to function as on-demand, for-hire transportation—violating SRQ Taxi's exclusive rights under the Concession Agreement and depriving SRQ Taxi of its reasonable contractual expectations. The Airport Authority is therefore liable to SRQ Taxi for breach of contract and breach of its implied covenant of good faith and fair dealing.

## I.   FINDINGS OF FACT

In the past, passengers arriving at the Sarasota-Bradenton International Airport without ground transportation already lined up had no problem finding a ride. A passenger could deplane, walk down the terminal toward the escalators, and take the escalator down to the ground level,[1] where he would see a sign telling him to

---

[1] Airport Authority's Ex. 74, Adv. Doc. No. 187-74.

take a right for ground transportation.[2] Just past baggage claim, roughly 150 steps

from the down escalator, the passenger would find a taxi starter, who would hail the

passenger a cab.[3] And up would pull a Diplomat taxi to take the passenger to his

final destination.

It had been that way for nearly thirty-five years. Back in 1982, the Airport

manager asked Diplomat Taxi if it wanted to be the sole taxi company providing

ground transportation at the Airport.[4] Diplomat agreed. So over the years, Diplomat

and the Airport Authority entered into a series of Concession Agreements that gave

Diplomat the right to pick up passengers who arrived at the airport without ground

transportation already lined up.[5]

The most recent Concession Agreement was entered into in 2009.[6] Under the

2009 Concession Agreement, which was for an initial term of five years plus an

additional five-year renewal term at the Airport Authority's option, Diplomat

(referred to under the agreement as a concessionaire) was granted the right to operate

a metered taxicab and nonmetered limousine service at the Airport:

> Concessionaire shall have the non-exclusive right to
> conduct a combination metered taxicab and non-metered
> limousine operation for the purpose of transporting airline

---

[2] Airport Authority's Exs. 58 – 60, Adv. Doc. No. 187-58 – 187-60.

[3] Airport Authority's Ex. 63, Adv. Doc. No. 187-63; 8/6/19 Trial Tr., Adv. Doc. No. 211, at p. 82, l. 19 – p. 83, l. 16.

[4] July 10, 2019 Deposition of Jorge Resendiz, Adv. Doc. No. 182-1, at p. 15, l. 25 – p. 16, l. 16.

[5] *Id.* at p. 17, l. 8 – p. 21, l. 9.

[6] SRQ Taxi's Ex. 7, Adv. Doc. No. 191-7.

> passengers and baggage from the Terminal and will furnish
> and operate at all times sufficient and suitable taxicabs and
> limousines to maintain adequate service required by
> Airport patrons.[7]

The right to operate a taxicab and limousine service at the Airport didn't come cheap.

There was a monetary cost: Under the Concession Agreement, Diplomat was required to pay the Airport Authority six cents per deplaning passenger.[8] In recent years, the number of deplaning passengers per month has ranged anywhere from 35,000 to nearly 100,000 passengers.[9] So, on average, Diplomat has been required to pay anywhere from $2,100 to $6,000 per month, regardless of whether Diplomat got one "pick-up" or 5,000 "pick-ups."

In addition to thousands of dollars a month in concession fees, there were onerous non-monetary costs, too. For one thing, Diplomat was required to provide sufficient taxi service to adequately meet *all* reasonable demands for taxi or limo service at the airport.[10] That meant Diplomat was required to provide taxi service at all times—day or night—required by passenger demand:

> Concessionaire shall promptly furnish taxi/limo service at
> all times during the day and night as may be required by
> passenger demand and as any certified passenger airline
> doing business at the Airport may from time to time

---

[7] *Id.* at § 4.1.

[8] *Id.* at § 2.1.

[9] SRQ Taxi's Ex. 15, Adv. Doc. No. 191-15.

[10] SRQ Taxi's Ex. 7, Adv. Doc. No. 191-7, at § 2.1; SRQ Taxi's Ex. 15, Adv. Doc. No. 191-15.

> reasonably request. Concessionaire shall provide taxi/limo
> service from the earliest scheduled air carrier arrival
> through the last scheduled arrival during any calendar day,
> each and every day of each year, throughout the term
> hereof.[11]

For another thing, Diplomat was required to comply with the Airport

Authority's Ground Transportation Rules, which are generally applicable to

commercial vehicles operating at the Airport.[12] The Ground Rules required

Diplomat to (among other things) provide high-quality cabs that were in excellent

condition; ensure that its logo or company name was on the outside of the cab;

maintain adequate automobile liability insurance naming the Airport Authority as an

additional insured; and ensure that its cab drivers were clean, neat, and courteous to

passengers.[13]

Although the Concession Agreement granted Diplomat the right to provide

taxi and limo services, other ground transportation providers were permitted to

operate at the airport as well. In fact, Article 4.3 of the Concession Agreement said

as much:

> Such rights herein granted [to] Concessionaire do not
> prevent the Authority from permitting other methods of
> passenger ground transportation, as for example rental
> cars, limousines, buses or private passenger cars not for
> hire.[14]

---

[11] SRQ Taxi's Ex. 7, Adv. Doc. No. 191-7, at § 5.2.

[12] Drivers' Ex. 10, Adv. Doc. No. 188-10, at § 1 ("It is imperative that all commercial vehicle operators abide by these Rules and Regulations.").

[13] *Id.* at § 3.1.

[14] SRQ Taxi's Ex. 7, Adv. Doc. No. 191-7, at § 4.3.

In particular, the Airport Authority specifically reserved the right to allow hotel, motel, and rental car courtesy cars, all of which operate on a not-for-hire basis, to pick up passengers at the Airport.[15] The Airport Authority also reserved the right to allow licensed taxicabs and limos to pick up passengers who had advance reservations.[16]

But the Ground Rules, consistent with the Concession Agreement, restricted the way other ground transportation operators could operate at the Airport. For instance, the Ground Rules limited ground transportation operators to picking up passengers in what was known as the "commercial vehicle queuing area," a three-lane driveway west of the baggage claim area.[17] According to the Ground Rules, Diplomat had the right to pick up passengers in Lane 1 (the inside lane), while commercial vehicles other than buses were restricted to Lane 2 and buses were restricted to Lane 3.[18]

The Ground Rules further provided that pick-ups by ground transportation operators other than Diplomat were permitted on a prearranged basis only:

> Passenger pickup by commercial vehicles is permitted only in the commercial vehicle queuing area. Pickups by

---

[15] *Id.* at § 4.3(A).

[16] *Id.* at § 4.3(B).

[17] Drivers' Ex. 10, Adv. Doc. No. 188-10, at § 3.3.3.

[18] *Id.* at § 3.3.5.

> Operators other than [Diplomat] may be made on a
> prearranged basis only.[19]

In fact, when commercial vehicles pull up to Lane 2, they are greeted by a sign that

reads, "Pre-Arranged Pick Up Vehicles Line Up Here."[20]

Yet another sign, one located at the door where passengers exit into the

commercial vehicle queuing area, notifies ground transportation operators that

Diplomat has the exclusive right to "walk up" customers and that ground

transportation operators other than Diplomat are prohibited from soliciting—i.e.,

directly or indirectly, actively or passively, openly or subtly trying to sell services—to

passengers without reservations:

> Diplomat has exclusivity for all "Walk Up" customers, no
> soliciting.[21]

For nearly thirty-five years, from 1982 to 2015, Diplomat was the only taxi

company that picked up arriving passengers at the airport who did not have ground

transportation reservations. In other words, for nearly thirty-five years, Diplomat was

the sole taxi company providing on-demand, for-hire ground transportation at the

Airport.

But that changed in 2015.

---

[19] *Id.* at § 3.3.3.

[20] Airport Authority's Ex. 71, Adv. Doc. No. 187-71.

[21] Airport Authority's Ex. 72, Adv. Doc. No. 187-72. The Ground Rules define "solicit" broadly to mean "directly or indirectly, actively or passively, openly or subtly, ask, request, seek, or try to obtain the purchase, sale, lease or exchange of goods or services, professional or otherwise, or to induce the public to enter any obligation relating to such property or services, or any form of paid advertising." Driver's Ex. 10, Adv. Doc. No. 188-10, at § 2.

Starting in early 2015, maybe even in late 2014, Uber and other Transportation Network Companies (known as TNCs) began appearing at the airport.[22] At first, the Airport Authority issued trespass warnings to Uber (and other TNC) drivers.[23] It is Airport policy that no ground transportation provider is allowed to operate at the Airport without a written agreement or a ground transportation permit from the Airport Authority.[24] Because the Uber drivers had neither, they were operating illegally at the Airport.[25]

By July 2015, however, the Airport Authority's attitude toward Uber (the primary TNC operating at the Airport) changed from one of vigorous opposition to, at least in the Airport Authority's telling, resigned acceptance. According to the Airport Authority, passengers were demanding TNC service, and Uber drivers were deceptive and hard to stop.[26] Not to mention that airports that had tried to resist Uber (and other TNCs) had faced pickets.[27] So rather than, in the Airport Authority's view, fight the inevitable, the Airport Authority decided to regulate Uber.

---

[22] 8/6/19 Trial Tr., Adv. Doc. No. 211, at p. 39, l. 24 – p. 40, l. 5.

[23] *Id.* at p. 39, l. 24 – p. 43, l. 11.

[24] Driver's Ex. 10, Adv. Doc. No. 188-10, at § 3.3.2 ("All commercial vehicles desiring to pick up passengers must obtain a Ground Transportation Permit and display the Authority approved permits sticker in the lower left corner of the front windshield for access to the commercial queuing area . . . ."); 8/6/19 Trial Tr., Adv. Doc. No. 211, at p. 42, ll. 19 – 23.

[25] Driver's Ex. 10, Adv. Doc. No. 188-10, at § 3.3.2; 8/6/19 Trial Tr., Adv. Doc. No. 211, at p. 40, l. 21 – p. 43, l. 11.

[26] 8/6/19 Trial Tr., Adv. Doc. No. 211, at p. 205, l. 21 – p. 207, l. 10; Airport Authority's Ex. 17, Adv. Doc. No. 187-17.

[27] 8/6/19 Trial Tr., Adv. Doc. No. 211, at p. 205, l. 21 – p. 207, l. 10.

In July 2015, the Airport Authority entered into an agreement allowing Uber to operate at the airport through the end of 2015.[28] In December 2015, the Airport Authority entered into a new one-year agreement with Uber that allowed Uber to operate at the Airport.[29] There were three significant aspects to the Airport Authority's operating agreement with Uber.

First, under the agreement, Uber was required to install a geofence—i.e., a virtual geographic boundary that enables software to trigger a response when a mobile device enters or leaves a particular area—to track its drivers at the airport.[30] Within the geofence is a "first in first out" (FIFO) zone. Once an Uber driver with his app open enters the FIFO zone, he will be placed in the queue in the same order he entered the FIFO zone.[31] When a passenger hails an Uber through the app, he will be matched with the first person in the queue.[32]

---

[28] SRQ Taxi's Ex. 10, Adv. Doc. No. 191-10.

[29] SRQ Taxi's Ex. 11, Adv. Doc. No. 191-11. The December 2015 agreement was for a one-year term, expiring on December 31, 2016. Because the Airport Authority and Uber could not agree to terms on a new operating agreement after the December 2015 agreement expired, the Airport Authority has continued to allow Uber to operate on a month-to-month basis.

[30] *Id.* at § 1.6 ("Operator shall demonstrate to Airport Authority that Operator has established a Geo-Fence to manage its airport business and shall notify affiliated drivers about the geo-fence.").

[31] 8/6/19 Trial Tr., Adv. Doc. No. 211, at p. 85, l. 10 – p. 87, l. 3.

[32] *Id.* at p. 86, l. 19 – p. 87, l. 3.

Second, once a passenger accepts the match, either Uber or a third-party company is notified that a "pick-up" has taken place. Under the operating agreement, Uber agreed to pay the Airport Authority $2.50 for each pick up.[33]

Third, contrary to the Ground Rules, which require commercial vehicles to pick up passengers in Lane 2 of the commercial vehicle queuing area, the operating agreement permits Uber drivers to pick up passengers in the short-term parking area, which is directly in front of the Airport's main terminal.[34]

Not long after the Airport Authority entered into the December 2015 operating agreement with Uber, SRQ Taxi took assignment of Diplomat's Concession Agreement with the Airport Authority.[35] In May 2016, just days after the Airport Authority formally approved the assignment of the Concession Agreement to SRQ Taxi, SRQ Taxi's president, Cullen Meathe, began complaining to the Airport Authority that it was "accommodating" Uber.[36] But Rick Piccolo, the Airport Authority's president, rejected the notion of any accommodation:

> The airport has designated an area in the public parking
> lot for Uber drivers to utilize per our agreement. It does
> not reserve any particular spaces but simply provides a

---

[33] SRQ Taxi's Ex. 11, Adv. No. 191-11, §§ 4.1 & 4.2. Under the operating agreement, Uber is required to pay a "monthly fee." *Id.* at § 4.1. The "monthly fee" is calculated by multiplying the number of "trips" (each instance in which an Uber driver picks up a passenger on Airport property) by the "per trip fee" (defined as a $2.50 fee). *Id.* at §§ 4.1(a) – (c); § 4.2(b).

[34] *Id.* at § 3.3(b); Airport Authority's Ex. 57, Adv. Doc. No. 187-57.

[35] SRQ Taxi's Ex. 9, Adv. Doc. No. 191-9.

[36] Airport Authority's Ex. 34, Adv. Doc. No. 187-34.

           designated general area where their customers can be
instructed to find them.[37]

By October 2016, however, the Airport Authority was more than

accommodating Uber and other TNCs—it was actively facilitating them. It appears

that TNCs such as Uber and Lyft were cutting into the Airport's two main drivers of

non-aeronautical revenue: parking and rental car concessions.[38] The Airport

Authority needed to find a way to maximize revenues.

So, less than six months after telling SRQ Taxi that it doesn't reserve parking

spots for Uber, the Airport Authority gave Uber (and Lyft) six reserved parking spots

in the prime row (Row A-8) of the short term parking area, where Uber (and other

TNC) drivers can wait to be hailed by passengers.[39] And, in response to its agreement

with Uber, the Airport increased the length of time Uber drivers can park for free in

their reserved spots from 20 minutes to 30 minutes.[40] The Airport Authority also

added signs (inside and outside the airport terminal) steering passengers to the six

reserved spots.[41]

---

[37] Id.

[38] 8/7/19 Trial Tr., Adv. Doc. No. 212, at p. 38, l. 25 – p. 40, l. 15.

[39] 8/6/19 Trial Tr., Adv. Doc. No. 211, at p. 60, l. 2 – p. 61, l. 15; 8/7/19 Trial Tr., Adv. Doc. No. 212, at p. 128, ll. 4 – 18.; Airport Authority Exs. 64 – 69, Adv. Doc. Nos. 187-64 – 187-69. It appears the reserved spots were initially in Row A-9. Sometime in 2017 or 2018, after some Airport renovations were completed, the spots were moved to Row A-8. 8/6/19 Trial Tr., Adv. Doc. No. 211, at p. 60, l. 2 – p. 61, l. 15.

[40] SRQ Taxi's Ex. 5, Adv. Doc. No. 191-5 ("We actually increased the time to 30 minutes of free parking, in response to the UBER agreement."). To be fair, the increased time applies to the general public, too.

[41] Airport Authority's Exs. 64 – 69; Adv. Doc. Nos. 187-64 – 187-69.

The Airport Authority has now made it as easy, if not easier, for a passenger arriving the Sarasota-Bradenton International Airport to hail an Uber as it is to hail an SRQ taxicab. Today, a passenger can deplane, walk down the terminal toward the escalators, and take the escalator down to the ground level, where, instead of turning right toward the taxi starter, the passenger will see a sign (with Uber and Lyft logos) directing him straight out the front of the airport terminal and across a covered walkway,[42] where he'll see another sign directing him down a paved sidewalk to the Uber and Lyft loading area.[43] Roughly 150 steps from the down escalator, the passenger will have arrived at the six reserved spots, each with its own Uber/Lyft reserved parking sign.[44] If, along the way, the passenger hailed an Uber on the app, or even if he waited until he got to the six reserved parking spots before hailing an Uber, the passenger will find his Uber driver waiting for him in one of the six spots.[45]

In the words of the Airport Authority's Properties and Advertising Administrator, the Airport Authority now gives Uber (and other TNCs) the "red carpet treatment."[46] By rolling out the red carpet for Uber, the Airport Authority has helped steer significantly more passengers to Uber and Lyft (and way from SRQ Taxi)—dramatically increasing the revenue it generates from ground transportation.

---

[42] Airport Authority's Ex. 70, Adv. Doc. No. 187-70.

[43] Airport Authority's Ex. 64 & 66 – 69, Adv. Doc. Nos. 187-64 & 187-66 – 187-69.

[44] Airport Authority's Ex. 65, Adv. Doc. No. 187-65.

[45] 8/6/19 Trial Tr., Adv. Doc. No. 211, at p. 85, l. 10 – p. 87, l. 3; SRQ Taxi's Ex. 40, Adv. Doc. No. 204-2.

[46] 8/6/19 Trial Tr., Adv. Doc. No. 211, at p. 87, ll. 4 – 15.

In the six months before the Airport Authority installed the signage and gave Uber the reserved parking spaces, SRQ Taxi got nearly 75% of the roughly 5,800 pick-ups.[47] Six months after the Airport Authority installed the signage and gave Uber the reserved parking spaces, the number of passengers needing a ride remained relatively constant, yet Uber (and Lyft) saw its share of the pick-ups increase from roughly 27% to roughly 62%, while SRQ Taxi saw its share of pickups drop by more than half: It dropped from nearly 75% to less than 30%.[48]

By March 2019, the figures were even more astonishing: In March 2019, 10,252 arriving passengers needed a ride—nearly double what it was three years earlier. Of those 10,252 passengers needing a ride, 9,076 (nearly 90%) took an Uber or Lyft, while only 1,176 (a little more than 10%) took a taxi.[49] Even though nearly twice as many passengers took ground transportation in March 2019 as they did in March 2016, SRQ Taxi has basically half the number of pick-ups as it did in March 2016.[50] Worse, under the Concession Agreement, SRQ Taxi was still required to pay the six cents per passenger (nearly $6,000) even though it saw its total pick-ups cut from more than 4,200 in March 2016 to less than 1,200 by March 2019.[51]

---

[47] SRQ Taxi's Ex. 15, Adv. Doc. No. 191-15.

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] *Id.*; SRQ Taxi's Ex. 7, Adv. Doc. No. 191-7, at § 2.1.

How has the Airport Authority fared? By helping steer 90% of the pick-ups to Uber and Lyft in March 2019, the Airport Authority generated more than $25,000 in revenue.

## II.   CONCLUSIONS OF LAW

SRQ Taxi has sued the Airport Authority for breach of contract.[52] Twenty-two of SRQ Taxi's taxi drivers have also asserted a breach of contract claim against the Airport Authority as intended third-party beneficiaries under the Concession Agreement.[53] The parties agreed to bifurcate the trial in this proceeding between liability and damages.[54] Therefore, the sole issue before the Court is whether the Airport Authority breached the Concession Agreement and the implied covenant of good faith and fair dealing.[55]

SRQ Taxi alleges it has the exclusive right to provide on-demand, for-hire, transportation at the airport. SRQ Taxi and the taxi drivers claim the Airport Authority breached the Concession Agreement by (among other things) allowing Uber and Lyft to operate on-demand, for-hire transportation services at the airport;

---

[52] Adv. Doc. No. 91. Originally, SRQ Taxi sued in federal district court for violation of 42 U.S.C. § 1983, breach of contract, and tortious interference. Adv. Doc. No. 1. After SRQ Taxi filed for chapter 11 bankruptcy, the district court referred SRQ Taxi's lawsuit to this Court. *Id.* This Court dismissed all but SRQ Taxi's breach of contract claim. Adv. Doc. Nos. 58 & 67. The Court also granted twenty-two taxi drivers leave to assert claims under the Concession Agreement as intended third-party beneficiaries. Adv. Doc. No. 67.

[53] Adv. Doc. No. 91.

[54] Adv. Doc. No. 178 at 1 ("Issues of liability and damages in this case have been bifurcated pursuant to the Parties' and the Court's agreement.").

[55] Adv. Doc. No. 178 at 9.

allowing Uber and Lyft to solicit passengers at the airport; and refusing to enforce the Ground Rules against Uber and Lyft.[56]

The Airport Authority denies that SRQ Taxi has an exclusive right to operate an on-demand, for-hire taxi service.[57] According to the Airport Authority, nothing in the Concession Agreement grants SRQ Taxi the right to exclude TNCs such as Uber and Lyft, and Article 27 of the Concession Agreement provides that any rights not granted to SRQ Taxi are expressly reserved to the Airport Authority.[58] And even if SRQ Taxi did have the exclusive right to provide on-demand transportation, which the Authority denies, the Authority says TNCs such as Uber and Lyft are not "on-demand."[59]

### A.    The Airport Authority breached the Concession Agreement by allowing TNCs to provide on-demand, for-hire transportation.

At first glance, the Authority's argument that SRQ Taxi does not have an *exclusive* right to provide "on-demand, for-hire" transportation has some merit. After all, as the Airport Authority points out, the parties' Concession Agreement repeatedly uses the term *non-exclusive* in describing SRQ Taxi's rights under the agreement.[60]

---

[56] Adv. Doc. No. 91 at ¶¶ 36 & 45.

[57] Adv. Adv. Doc. No. 228 at 9.

[58] *Id.*

[59] *Id.*

[60] *Id.* at 4 (citing Concession Agreement, §§ 1.1 & 4.1).

For example, in the recitals, the Concession Agreement provides that "the Authority is willing to grant *non-exclusive* rights" to SRQ Taxi to provide taxi and limo services at the Airport.[61] More important, SRQ Taxi's rights are set forth in Article 4, which is titled "Non-Exclusive Rights." And Article 4.1, which delineates SRQ Taxi's rights, expressly provides that SRQ Taxi shall have the *non-exclusive* right to provide metered taxicab and nonmetered limousine services at the Airport:

> **4.1 <u>Concessionaire's Rights</u>.**
>
> Concessionaire shall have the *non-exclusive right* to conduct a combination metered taxicab and non-metered limousine operation for the purpose of transporting airline passengers and baggage from the Terminal and will furnish and operate at all times sufficient and suitable taxicabs and limousines to maintain adequate service required by Airport patrons.[62]

Because Article 4.1 says SRQ Taxi's rights are *non-exclusive*, the Airport Authority contends SRQ Taxi cannot claim an *exclusive* right to provide on-demand ground transportation.

1. **SRQ Taxi has the exclusive right to operate an on-demand, for-hire taxi service.**

While the Airport Authority's interpretation has some merit, it ultimately runs afoul of a cardinal rule of contractual interpretation: When interpreting a contract,

---

[61] SRQ Taxi's Ex. 7, Adv. Doc. No. 191-7, at 1 (emphasis added).

[62] *Id.* at § 4.1 (emphasis added).

the Court must do so in a way that gives meaning to *all* the contract's provisions.[63]

Here, the Airport Authority's interpretation of the Concession Agreement renders

Article 4.3 meaningless.

Article 4.3 of the Concession Agreement, titled "Authority's Right to Permit

Other Ground Transportation," provides that the rights granted to SRQ Taxi in

Article 4.1 do not prevent the Airport Authority from permitting other methods of

ground transportation:

> Such rights herein granted Concessionaire do not prevent
> the Authority from permitting other methods of passenger
> ground transportation, as for example rental cars,
> limousines, buses or private passenger cars not for hire.[64]

Later in Article 4.3, the Airport Authority specifically reserves the right to permit

other properly marked, licensed taxicabs and limos to pick up passengers who have

made specific advance reservations.[65]

If, as the Airport Authority contends, SRQ Taxi only has a *non-exclusive* right

to provide taxicab and limousine services, there would be no need for the Concession

Agreement to spell out the Airport Authority's right to permit other ground

transportation. In particular, there would be no need for the Airport Authority to

---

[63] *BVS Acquisition Co. v. Brown*, 649 F. App'x 651, 662 (11th Cir. 2016) ("Under Florida law, courts are to interpret the terms of a contract to give meaning to all of its provisions.") (citing *USB Acquisition Co. v. Stamm*, 660 So. 2d 1075, 1080 (Fla. 4th DCA 1995)); *Ceradini v. IGT Servs., Inc.*, 959 So. 2d 348, 351 (Fla. 3d DCA 2007) (explaining that "it is a cardinal principal of contract construction that agreements are to be interpreted so as to give meaning to all their provisions.").

[64] SRQ Taxi's Ex. 7, Adv. Doc. No. 191-7, at § 4.3.

[65] *Id.* at § 4.3(B).

reserve the right to permit taxicabs and limos to pick up passengers with advance reservations. It would already have that right. Under the Airport Authority's interpretation, then, Article 4.3 is superfluous.

Normal rules of contract interpretation require a court to avoid an interpretation that would render a contractual provision superfluous or meaningless.[66] When a court is faced with two possible interpretations of a contract, one that gives meaning to the entire contract and another that renders part of the contract meaningless, the interpretation that gives meaning to the entire contract should be preferred to one that renders part of the contract meaningless.[67]

Here, there is an interpretation of the Concession Agreement—one advanced by SRQ Taxi—that gives meaning to Article 4.3. Under that interpretation, Articles 4.1 and 4.3 must be read together. Article 4.1 grants a non-exclusive right to SRQ Taxi to provide metered taxicab and non-metered limousine transportation, while Article 4.3 limits the extent to which SRQ Taxi's right is non-exclusive.

Put another way, SRQ Taxi's right to provide metered taxicab and non-metered limousine service is exclusive, except to the extent that Article 4.3 permits the Airport Authority to authorize other ground transportation. Under this reading,

---

[66] *Veniard v. NB Holdings Corp.*, 2000 WL 33988085, at *8 (M.D. Fla. Aug. 8, 2000); *Publix Super Markets, Inc. v. Wilder Corp. of Delaware*, 876 So. 2d 652, 654 (Fla. 2d DCA 2004) (explaining that "[c]ourts must 'construe contracts in such a way as to give reasonable meaning to all provisions,' rather than leaving part of the contract useless.").

[67] *Gustafsson v. Aid Auto Brokers, Inc.*, 212 So. 3d 405, 408 (Fla. 4th DCA 2017) ("Moreover, 'an interpretation which gives a reasonable meaning to all provisions of a contract is preferred to one which leaves a part useless or inexplicable.'") (quoting *Premier Ins. Co. v. Adams*, 532 So. 2d 1054, 1057 (Fla. 5th DCA 1994)).

Article 4.1 refers to SRQ Taxi's rights as non-exclusive because the Airport Authority has the right to permit other ground transportation providers identified in Article 4.3 to operate at the Airport. This interpretation, unlike the one advanced by the Airport Authority, gives meaning to the term "non-exclusive," as well as meaning to Article 4.3.

The Court must therefore look to Article 4.3 to determine the extent of the rights granted to SRQ Taxi under Article 4.1. Unsurprisingly, Article 4.3 makes no mention of TNCs. Although Uber and Lyft may have technically existed when the Concession Agreement was entered into in 2009, SRQ Taxi and the Airport Authority agree that TNCs were not prevalent—much less operating at the Airport—in 2009. Because Article 4.3 does not specifically include TNCs, the Court must resort to another canon of contractual interpretation: *noscitur a sociis*.

*Noscitur a sociis* is Latin for "a word is known by the company it keeps."[68] Under the doctrine of *noscitur a sociis*, when general and specific words are capable of having analogous meanings, the meaning of general words is restricted to the meaning of the more specific words.[69] Take the Second District Court of Appeal's decision twelve years ago in *Stratton v. Sarasota County* as an example.[70]

---

[68] *Stratton v. Sarasota Cnty.*, 983 So. 2d 51, 56 (Fla. 2d DCA 2008).

[69] *Id.*

[70] *Id.*

In *Stratton*, the Second District Court of Appeal considered whether payroll expenses for code enforcement employees was a "cost of demolition and removal" under the county's demolition ordinance.[71] Following the general term "costs of demolition and removal" in the ordinance were specific examples of types of demolition and removal costs:

> The Building Official shall assess the entire *cost of demolition and removal* including *asbestos abatement, the sodding or seeding of the lot, and rodent extermination* against the real property in the form of a lien.[72]

The *Stratton* Court concluded that payroll expenses were unlike, or not analogous to, asbestos abatement, the sodding or seeding of the lot, or rodent extermination.[73] Therefore, applying the doctrine of *noscitur a sociis*, the Second District Court of Appeal held that payroll expenses were not a "cost of demolition."[74]

Like the ordinance in *Stratton*, Article 4.3 contains a general phrase ("other methods of passenger ground transportation") followed by specific examples ("rental cars, limousines, buses or private passenger cars not for hire).[75] Two of the examples—rental cars and private passenger cars not for hire—are not "for hire" transportation, while one of the remaining two examples—buses—is plainly not "on

---

[71] *Id.*

[72] *Id.*

[73] *Id.* at 57.

[74] *Id.*

[75] SRQ Taxi's Ex. 7, Adv. Doc. No. 191-7, at § 4.3.

demand." Only one of the examples is arguably on-demand, for-hire transportation: limos.

But other language in Article 4.3 restricts limos to those with specific advanced reservations:

> The Authority reserves the right to permit other properly marked, licensed taxicabs and limos to pick up *passengers who have made specific advanced reservations for such pick-ups.*[76]

Thus, applying the doctrine of *noscitur sociis*, Article 4.3 limits the Airport Authority's right to permit other methods ground transportation to either those that are not "for hire" or those that require specific advance reservations (i.e., are not on-demand). The corollary to that interpretation is that Articles 4.1 and 4.3, when read together, grant SRQ Taxi the exclusive right to provide on-demand, for-hire transportation.

The Airport Authority contends it could not have granted SRQ Taxi any exclusive right because it was forbidden by a federal regulation from doing so. It is true that a rule promulgated by the Federal Aviation Administration bars the Airport Authority from entering into a long-term exclusive concession agreement without first obtaining FAA approval.[77]

The evidence at trial established that the Concession Agreement in this case is a "long-term" agreement. Long-term agreements are those that exceed five years

---

[76] *Id.* at § 4.3(B).

[77] 49 C.F.R. § 23.5.

(including any options).[78] Including the option in this case, the Concession

Agreement is ten years (the original five-year term plus a five-year option).[79] The

evidence at trial likewise established that the Airport Authority never obtained FAA

approval to enter into the Concession Agreement. So, the Airport Authority reasons,

the Concession Agreement could not grant SRQ Taxi any exclusive rights.[80]

Even though the Court has concluded that SRQ Taxi has the exclusive right to

provide on-demand, for-hire transportation under the Concession Agreement, the

Court is not persuaded that the Concession Agreement is "exclusive" *for purposes of

the FAA regulation*. To see why, look no further than the FAA's guidance for

evaluating long-term, exclusive agreements, which the Airport Authority offered into

evidence at trial.[81]

To help the Airport Authority determine if it is entering into a long-term,

exclusive concession agreement, the FAA guidance provides hypothetical examples.

This one is particularly instructive:

> A full-service restaurant, with a lease agreement for seven
> years, has the sole right to operate a sit-down
> establishment, while a second business has the sole right to
> sell hot dogs, pizza, and other carryout items at the
> airport, also for seven years. Neither has an "exclusive"

---

[78] Airport Authority's Ex. 10, Adv. Doc. No. 187-10, at § 1.3 ("For purposes of this guidance and in reference to § 23.75, a 'long-term agreement' is defined as any agreement between a sponsor and a single concessionaire or multiple consecutive concessionaires that has a term of more than five years in duration. 'More than five years' includes any combination of base term and options . . . .").

[79] SRQ Taxi's Ex. 7, Adv. Doc. No. 191-7, at §§ 1.1 & 1.2.

[80] Adv. Doc. No. 228 at 15 – 16.

[81] Airport Authority's Ex. 10, Adv. Doc. No. 187-10, § 3.2, Example 1.

> agreement . . . since there are two different providers and
> FAA approval would not be required. The determining
> factor is that both food operators provide meal items.[82]

Applying that hypothetical to the facts of this case, it's easy to see why the Concession Agreement does not run afoul of the FAA regulations even though it grants SRQ Taxi exclusive rights. In the hypothetical, two food providers were each granted an exclusive right to provide certain types of food (one a sit-down restaurant; the other carryout items). Because both food providers provided meal items, albeit different types, the agreements did not require FAA approval even though the agreements provided for certain exclusivity.

So too here. The Airport Authority allows multiple ground transportation companies to operate at the airport. One of those companies—SRQ Taxi—has the exclusive right to provide on-demand, for-hire transportation. The other transportation companies can provide prearranged (or not-for-hire) transportation. Because multiple ground transportation providers provide ground transportation at the airport, the Concession Agreement did not require FAA approval even though it granted SRQ Taxi the exclusive right to provide on-demand, for-hire transportation. Thus, the FAA's prohibition against unapproved long-term, exclusive agreements does not change the fact that the plain and unambiguous language of the Concession Agreement grants SRQ Taxi the exclusive right to provide on-demand, for-hire transportation.

---

[82] *Id.*

24

### 2.    The Airport Authority has allowed TNCs to provide on-demand, for-hire ground transportation.

Even if SRQ Taxi had the exclusive right to provide on-demand, for-hire transportation, the Airport Authority contends TNCs are not on-demand like taxis are. Unlike taxicabs, the Airport Authority says, TNCs are hailed by apps.[83] Before a passenger can request a ride from a TNC, the person must first download a smart phone app and then prearrange a ride through the app:

> When a person is seeking a ride with a TNC, such as Uber Technologies, LLC, the rider activates the app on his or her smart phone, enters his or her destination and pick-up location, and requests a ride. . . . The rider's request for a ride is transmitted by the TNC through a proprietary algorithm to a TNC driver for a fixed period of time. The TNC driver is able to accept or reject the request. If the TNC driver rejects the request, the request then goes to another TNC driver for a fixed period of time and so on until a rider and a TNC driver are matched with one another. Once matched, the rider sees the TNC driver's photo, name, vehicle type and license plate. The rider also sees the location of the TNC driver's vehicle on a map. The rider then proceeds to the pickup point.[84]

To hear the Airport Authority tell it, there is a lag between the time the passenger requests a ride and the time the Uber driver is matched with the passenger and then eventually locates the passenger at the airport. It's easy to envision, in the Airport Authority's telling, the weary passenger stuck waiting curbside, with rolling

---

[83] Adv. Doc. No. 228 at 8. The Airport Authority offers other differences between TNCs and taxis. For instance, taxis, unlike TNCs, provide metered services and do not establish the fare before the customer gets in the cab. *Id.* While that may be true, it has nothing to do with whether a TNC such as Uber is "on-demand."

[84] *Id.* at 9.

suitcases and carry-on bags, while the app tries to match the passenger with a driver and then the driver tries to locate the passenger at a busy airport. But that scenario, at least according to the evidence at trial, isn't what's happening at the Airport.

Indeed, the evidence at trial tells a much different story: Unlike the taxicab drivers, who have to be there from the first arriving flight of the day to the last arriving flight of the day, Uber or Lyft drivers can cherry pick the busiest flights of the day and arrive moments before flight arrives, parking for free in a reserved spot in the prime row in short-term parking for up to 30 minutes. As soon as the Uber driver enters the geofence surrounding the airport, he will be placed first in the queue.

After a passenger deplanes, he can simply walk down the terminal and take the escalator to the ground level, where he'll find signs (with Uber and Lyft logos) directing him straight out the automatic doors, across a covered walkway, and down a paved sidewalk to the reserved spot for Uber (and Lyft) drivers. If the passenger hails an Uber while walking the roughly 150 steps it takes to get from the escalator to the reserved Uber spots, he will find his Uber driver waiting for him.

In fact, the passenger doesn't even have to hail an Uber while he's walking the 150 steps it takes to get to the reserved Uber parking spots. The passenger can wait until he gets to the parking spots before hailing the Uber. And, in that case, the passenger will get one of the Uber drivers parked in the reserved spots.

For all intents and purposes, hailing an Uber at the Airport is no different than hailing a taxi. In fact, the only difference is how you hail the Uber or the taxi. For a taxicab, you ask the taxi starter. For an Uber, you do it through the app. In effect, the

app, at least as Uber is being allowed to operate at the Airport, functions as an automated taxi starter. Regardless of whether a passenger uses the taxi starter or the Uber app, when the passenger requests a ride, the driver—whether it's a taxi driver or an Uber driver—is waiting there for the passenger. Because there is no wait involved for an Uber, Uber (and other TNCs) are functioning as on-demand transportation at the Airport.

Would it be different if TNCs such as Uber were required to queue in a remote airport lot or off the airport property? Perhaps. That would certainly make Uber closer to prearranged—i.e., not on demand—transportation. But the Court need not decide that today.

Today, the Court is tasked with deciding whether the current arrangement violates SRQ Taxi's exclusive right to provide on-demand, for-hire transportation. Whatever "on-demand" transportation means, it must, at a minimum, include the ability of a passenger to walk up and hop in without waiting. By providing TNCs reserved spots in the prime row in the short-term parking lot and allowing TNCs to park there free of charge for up to 30 minutes at a time, the Airport Authority has made it so that passengers can walk up, hail an Uber, and hop in without waiting. That is allowing TNCs to provide on-demand transportation.

Even the Airport Authority admits as much. In a memo discussing possible options for charging TNCs going forward, the Airport's Director of Properties, John Schussler, acknowledged that TNCs staged in the short-term parking area are on-demand:

> We can debate with the TNCs if their fee would be the
> same as the other prearranged $3-$4 or the same as the on-
> demand $4-$5 (some TNCs stage in the short-term lot so
> are on-demand).[85]

More significant, in discussing proposed state legislation governing TNCs, the

Airport Authority's president acknowledges that a TNC staged in a reserved parking

space in the short-term lot is a walk-up pick-up—i.e., on-demand:

> [The Florida Legislature's] definition of "Prearranged
> Ride" in the bill is much different than in our Ground
> Transportation Rules and Regs. If a passenger walked out
> of the terminal to the reserved spaces in our parking lot,
> there might be several TNC drivers waiting. At that time,
> the passenger could open his Uber or Lyft app and select
> one of the drivers who is already prearranged pickup. Our
> Ground Transportation Rules and Regs would call that
> walk up pickup, which our Contract Taxi company has the
> sole right to do at [the Airport] and this would be unfair in
> my opinion.[86]

### B. The Airport Authority has breached its implied duty of good faith and fair dealing.

The Airport Authority contends that it has a "get out of jail free" card: Article

27. Article 27 of the Concession Agreement reserves to the Airport Authority any

rights not granted to SRQ Taxi:

> Rights not specifically granted to the Concessionaire by
> this Agreement are expressly and independently reserved
> to the Authority.[87]

---

[85] SRQ Taxi's Ex. 39, Adv. Doc. No. 204-1, at 1.

[86] SRQ Taxi's Ex. 40, Adv. Doc. No. 204-2.

[87] SRQ Taxi's Ex. 7, Adv. Doc. No. 191-7, at § 27.

The Airport Authority appears to take the position that because Article 4.1 of the Concession Agreement doesn't grant SRQ Taxi the right to exclude TNCs from the airport grounds, then the Airport Authority has reserved the right to permit TNCs to operate at the Airport.[88]

But this argument begs the question. It assumes the very question this Court must decide: whether the Concession Agreement grants SRQ Taxi the exclusive right to provide on-demand, for-hire transportation. Because the Court has decided that the Airport Authority granted SRQ Taxi the exclusive right to provide on-demand, for-hire transportation, Article 27 doesn't even come into play. But assuming it did come in to play, Article 27 still is not a "get out of jail free card."

Under Florida law, every contract carries with it an implied covenant of good faith and fair dealing.[89] "Where a contract's terms 'afford a party substantial discretion to promote that party's self-interest, the duty to act in good faith nevertheless limits the party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.'"[90] Here, Article 4.3 of the Concession Agreement gives the Airport Authority substantial discretion to permit other methods of ground transportation.

---

[88] Adv. Doc. No. 228 at 9.

[89] *Elec. Mach. Enters. v. Hunt Constr. Grp. (In re Elec. Mach. Enters., Inc.)*, 416 B.R. 801, 880 (Bankr. M.D. Fla. 2009).

[90] *Id.*

But SRQ Taxi reasonably expected that it had the exclusive right to be the on-demand, for-hire ground transportation provider. More than thirty-five years ago, the Airport Authority asked SRQ Taxi's predecessor (Diplomat) if it wanted to be the sole on-demand taxicab and limo operator. And for nearly thirty-five years, Diplomat was, in fact, the exclusive provider of on-demand, for-hire transportation.

Over those thirty-five years, Diplomat and SRQ have paid for that right. Putting aside the substantial non-monetary costs, including being required to provide sufficient taxi service to adequately meet *all* reasonable demands for taxi or limo service at the airport from the first scheduled flight of the day to the last scheduled flight of the night, SRQ Taxi has incurred substantial monetary costs in the form of concession fees—i.e., six cents per deplaning passenger.[91]

By agreeing to pay six cents per deplaning passenger, SRQ Taxi is, in effect, buying access to potential customers. It knows that a certain percentage of deplaning passengers will need ground transportation. From March 2016 through March 2019, the percentage of deplaning passengers using ground transportation has, on average, hovered around 9 – 11%.[92] In raw (round) numbers, the number of potential riders ranged anywhere from 3,700 to 10,200.[93] So SRQ Taxi has been paying anywhere

---

[91] SRQ Taxi's Ex. 7, Adv. Doc. No. 191-7, at § 2.1.

[92] SRQ Taxi's Ex. 15, Adv. Doc. No. 191-15.

[93] *Id.*

from $2,100 to $6,000 per month in concession fees to gain access to those 3,700 to 10,200 potential customers.[94]

But, by providing signage and reserved spots to Uber and Lyft, the Airport Authority has been steering those potential customers to Uber and Lyft. And the ridership data bears that out. From March 2016 (six months before the Airport Authority provided the signage and reserved parking spots) to March 2019, SRQ Taxi (and its predecessor) has seen its share of pick-ups fall from roughly 75% to less than 30%.[95] The raw numbers are even more staggering: Even though the total number of pick-ups over that same period has increased from 5,823 to 10,252, the total number of pick-ups SRQ Taxi (and its predecessor) has gotten has decreased from 4,235 to 1,176.[96] Worse, because the total number of deplaning passengers increased to nearly 100,000, SRQ Taxi had to pay nearly $6,000 for fewer than 1,200 pick-ups.[97] By steering the potential customers to Uber and Lyft, while still insisting that SRQ Taxi pay its concession fees, the Airport Authority has destroyed SRQ Taxi's reasonable contractual expectations.

The Airport Authority, however, claims it had no choice but to allow TNCs to operate at the Airport. After all, customers were demanding it, and it would have

---

[94] *Id.*; SRQ Taxi's Ex. 7, Adv. Doc. No. 191-7, at § 2.1.

[95] SRQ Taxi's Ex. 15, Adv. Doc. No. 191-15.

[96] *Id.*

[97] *Id.*; SRQ Taxi's Ex. 7, Adv. Doc. No. 191-7, at § 2.1.

been virtually impossible to stop TNCs from operating at the Airport. But this argument misses the mark.

Of course, the Airport Authority could have allowed TNCs such as Uber to operate at the Airport. Even SRQ Taxi concedes as much.[98] But what the Airport Authority could not do was give Uber and Lyft the red carpet treatment and allow them to function as on-demand transportation providers, making it cheaper and more convenient for passengers to use TNCs than SRQ Taxi's taxicabs.[99] It is by giving TNCs the red carpet—not just allowing TNCs to operate at the airport—that the Airport Authority destroyed SRQ Taxi's reasonable contractual expectations— and therefore breached its implied covenant of good faith and fair dealing.

### C.   The Airport Authority's affirmative defenses do not preclude a finding of liability.

In all, the Airport Authority raises five affirmative defenses: Impossibility of performance; frustration of purpose; enactment of section 627.428, Florida Statutes, which governs the regulation of TNCs at the airport; waiver; and estoppel.[100] None of these defenses require much discussion.

---

[98] 8/7/19 Trial Tr., Adv. Doc. No. 212, at p. 132, ll. 10 – 17 ("And, you know, it's just – you know, I'm not saying that the TNCs don't belong at the airport. What I'm saying is the TNCs don't belong in reserved on-demand spaces at the airport. If they treated them like every other airport treated them, then I wouldn't have much of a beef because they wouldn't give them the ability to do what they've done, which is to portray themselves as the on-demand – or the second on-demand concessionaire at the airport.").

[99] *Id.* at p. 126, l. 21 – p. 130, l. 18.

[100] Adv. Adv. Doc. No. 228 at 21 – 25.

The first three defenses (impossibility of performance; frustration of purpose; and enactment of section 627.428, Florida Statutes) are all built on the same faulty premise—i.e., it is either impossible for the Airport Authority to stop TNCs from operating at the Airport or that the Airport Authority is now prohibited under section 627.428 from stopping TNCs or regulating the quality and age of their cars, the dress of their drivers, or Uber's insurance requirements.[101]

As explained above, SRQ Taxi does not take the position that the Airport Authority breached the Concession Agreement by allowing TNCs to operate at the airport. SRQ Taxi has conceded that TNCs are permitted to operate at the airport.[102] Rather, SRQ's primary complaint, which the Court has agreed with, is that the Airport Authority was contractually prohibited from giving TNCs the red carpet treatment and allowing them to function as on-demand transportation providers. Neither the related doctrines of impossibility of performance and frustration of purpose nor the enactment of section 627.428, Florida Statutes, gives the Airport Authority any excuse for allowing TNCs to function as on-demand, for-hire ground transportation.

The last two defenses—waiver and estoppel—are equally unavailing. Frankly, the waiver and estoppel defenses are hard to understand much less restate here with

---

[101] *Id.* at 23 – 24.

[102] 8/7/19 Trial Tr., Adv. Doc. No. 212, at p. 132, ll. 10 – 17.

any confidence.[103] The gist of both defenses seems to be that SRQ Taxi gave up the right to claim that it had the exclusive right to provide on-demand, for-hire transportation by (1) assuming an agreement that referred to SRQ Taxi's rights as non-exclusive and (2) failing to disclose to the Airport Authority, at the time the Airport Authority approved the assumption in May 2016, that SRQ Taxi believed it had exclusive rights.[104]

As for waiver, SRQ Taxi did not, as the Airport Authority claims, take assignment of an agreement that expressly stated its rights were non-exclusive. As the Court has already concluded, even though the Concession Agreement uses the term non-exclusive, when read as a whole, it grants SRQ Taxi the exclusive right to provide on-demand, for-hire transportation. As for estoppel, the Airport Authority fails to point to any evidence showing that SRQ Taxi represented to the Airport Authority that it did not have the exclusive right to on-demand, for-hire transportation.[105]

In any case, the Airport Authority's waiver and estoppel defenses overlook a larger point. The primary thrust of SRQ Taxi's claim is that the Airport Authority breached the Concession Agreement by giving TNCs the red carpet treatment—i.e., providing signage and reserved spots in a prime row in the short-term parking area.

---

[103] Adv. Adv. Doc. No. 228 at 21 – 23.

[104] *Id.*

[105] *Id.*

All that happened after SRQ Taxi took assignment of the Concession Agreement. So SRQ Taxi could not have waived—nor should it be estopped—from asserting the Airport Authority's breach.

### D.    The Airport Authority's liability is limited to SRQ Taxi.

Now that the Court has determined that the Airport Authority breached the Concession Agreement, it must determine to whom the Airport Authority is liable. Because SRQ Taxi is a party to the Concession Agreement, the Airport Authority is obviously liable to SRQ Taxi. But what about the individual taxi drivers, who are not party to the concession agreement?

Under Florida law, a person who is not a party to a contract ordinarily is not entitled to sue to enforce—and therefore would not be entitled to damages resulting from breach of—the contract.[106] Florida law, however, makes an exception for intended third-party beneficiaries.

Both parties agree that a person is an intended third-party beneficiary of a contract only when both parties to the contract clearly express an intent to *primarily* and *directly* benefit the third party.[107] According to the individual taxi drivers, the intent of the parties ordinarily is determined from reading the contract as a whole.

---

[106] *Caretta Trucking v. Cheoy Lee Shipyards, Ltd.*, 647 So. 2d 1028, 1031 (Fla. 4th DCA 1994).

[107] Doc. No. 228 at 25 (citing *Caretta Trucking v. Cheoy Lee Shipyards, Ltd.*, 647 So. 2d 1028, 1031 (Fla. 4th DCA 1994)); Drivers' *Proposed Findings of Fact and Conclusions of Law* at 4 (citing *Greenacre Properties, Inc. v. Rao*, 933 So.2d 19, 23 (Fla. 2d DCA 2006)).

Reading the Concession Agreement as a whole, the Court sees no intent to *primarily* and *directly* benefit the drivers.

To claim that it does, the individual taxi drivers recite six different provisions of the Concession Agreement that they claim govern or benefit them.[108] But only two of them even mention drivers.[109] One of those provisions simply requires driver logs to be available on request.[110] While the other provision, the only one that references the individual drivers in any meaningful way, governs SRQ Taxi's employees generally—not just tax drivers.[111]

And that provision—Article 5.10—requires SRQ Taxi to ensure that its drivers are at least 18 years old, hold a valid driver's license; are legally authorized to work in the United States, hold a valid driver's license; and speak and understand English.[112] Article 5.10 also requires SRQ Taxi's drivers to remain within ten feet of their cabs or limos.[113] That language plainly does not demonstrate an intent to primarily or directly benefit the individual taxi drivers.

---

[108] Drivers' Proposed Findings of Fact and Conclusions of Law at 2 -3 (citing Concession Agreement, §§ 5.2, 5.4, 5.5, 5.7, 5.8, 5.10.

[109] SRQ Taxi's Ex. 7, Adv. Doc. No. 191-7, at § 5.7 & 5.10.

[110] *Id.* at § 5.7.

[111] *Id.* at § 5.10.

[112] *Id.*

[113] *Id.*

The individual taxi drivers also rely on the testimony of Jorge Resendiz, Diplomat's owner. Resendiz testified his intent in entering into the original Concession Agreement was to benefit his independent contractor drivers, his company, the customers, and the Airport.[114] Even assuming that's true, the drivers must prove that *both* parties intended to benefit the taxi drivers. Because the record is devoid of any evidence that the Airport Authority intended to benefit the individual taxi drivers, the individual taxi drivers are not intended third-party beneficiaries and are not entitled to enforce the Concession Agreement.

## III.  CONCLUSION

To hear the Airport Authority tell it, it was in a predicament: Passengers were demanding TNCs such as Uber and Lyft, and there was no way to keep TNCs from operating at the Airport. Not to mention that other Airports that resisted TNCs found themselves on the wrong end of pickets. So the Airport Authority capitulated and decided to permit TNCs to operate at the Airport.

Under the Concession Agreement, the Airport Authority had the right to do so. But it did not have the right to allow TNCs to function as on-demand, for-hire transportation. The exclusive right to provide on-demand, for-hire transportation belonged to SRQ Taxi.

By giving TNCs six reserved parking spots in the short-term parking area and providing signage to steer passengers to the TNCs, the Airport Authority allowed

---

[114] Resendiz Depo., Adv. Doc. No. 182-1, at p. 61, ll. 22 – 25.

TNCs to function as on-demand, for-hire transportation in an effort to further the Airport Authority's own economic interest—thereby violating SRQ Taxi's exclusive rights under the Concession Agreement and depriving SRQ Taxi of its reasonable contractual expectations. Therefore, the Airport Authority is liable to SRQ Taxi for breach of contract and breach of the implied covenant of good faith and fair dealing.

The Court will schedule a separate trial on the damages to which SRQ Taxi is entitled as a result of the Airport Authority's breach. At the conclusion of the damages trial, the Court will enter a final, appealable judgment.

---

Attorney Bart Houston is directed to serve a copy of these Findings of Fact and Conclusions of Law on interested parties who do not receive service by CM/ECF and file a proof of service within three days of entry of this order.

---

**Bart A. Houston, Esq.**
**The Houston Firm, P.A.**
*Counsel for SRQ Taxi*

**James E. Aker, Esq.**
**E. Dusty Aker, Esq.**
**Aker Law Firm, P.A.**
*Counsel for Individual Drivers*

**M. Lewis Hall, III, Esq.**
**Williams, Parker, Harrison Dietz & Getzen**

and

**Charles F. Ketchey, Esq.**
**John D. Goldsmith, Esq.**
**William A. McBride, Esq.**
**Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, P.A.**
*Counsel for Sarasota Manatee Airport Authority*