ORDERED.

**Dated: January 26, 2023**

Caryl E. Delano
Chief United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                          Case No. 8:17-bk-07782-CED
                                                Chapter 11
SRQ Taxi Management, LLC,

      Debtor.

_____/

SRQ Taxi Management, LLC,                        Adv. No. 8:18-ap-00013-CED

      Plaintiff,

v.

Sarasota Manatee Airport Authority,

      Defendant.

_____/

## MEMORANDUM OPINION AND ORDER
## GRANTING DEFENDANT'S *DAUBERT* MOTION

The parties in this adversary proceeding, SRQ Taxi Management, LLC ("SRQ

Taxi") and the Sarasota Manatee Airport Authority ("the Airport Authority") agreed

to bifurcate the issues of liability and damages at trial.[1] Bankruptcy Judge Michael G. Williamson conducted the liability phase of the trial on SRQ Taxi's claims for breach of a concession agreement and breach of the implied covenant of good faith and fair dealing and ruled in favor of SRQ Taxi.[2]

Prior to the damages phase of the trial, the Airport Authority filed a motion to preclude the testimony of SRQ Taxi's expert witness under Federal Rule of Evidence 702 (the "*Daubert* Motion").[3] Judge Williamson denied the *Daubert* Motion without prejudice, subject to renewal after the parties' experts testified at trial.[4] He then conducted a three-day trial on damages. At the conclusion of the trial, the Airport Authority renewed its *Daubert* Motion.[5]

Judge Williamson took the matter under advisement,[6] but prior to ruling, he passed away, and the case was reassigned to Chief Judge Caryl E. Delano. Chief Judge Delano certifies under Federal Rule of Civil Procedure 63 that she is familiar with the record in this

---

[1] Adv. Doc. No. 178 at 1 ("Issues of liability and damages in this case have been bifurcated pursuant to the Parties' and the Court's agreement.").

[2] *Findings of Fact & Conclusions of Law*, Adv. Doc. No. 230, at 15 – 38.

[3] Adv. Doc. No. 324.

[4] As the finder of fact, Judge Williamson did not have the same "gatekeeper" concerns as would a judge conducting a jury trial. Rather than conducting an evidentiary hearing on the *Daubert* Motion, Judge Williamson allowed SRQ Taxi to put on its expert testimony at trial, at which point he would be better situated to determine whether the testimony satisfied Federal Rule of Evidence 702. Adv. Doc. No. 341.

[5] 9/30/21 Trial Tr., Adv. Doc. No. 385, p. 200, l. 13 – p. 201, l. 6.

[6] 9/30/21 Trial Tr., Adv. Doc. No. 385, p. 200, l. 13 – p. 201, l. 6.

proceeding and that she is able to determine this proceeding without prejudice to the parties.

As set forth below, the Court will grant the *Daubert* Motion because the testimony of SRQ Taxi's expert was not based on sufficient facts or data, is not reliable, and is therefore inadmissible under Evidence Rule 702.

## I.    BACKGROUND[7]

SRQ Taxi, the Debtor in this chapter 11 case, provided on-demand taxicab and limousine services.[8]

For more than thirty years, SRQ Taxi (and its predecessor in interest) was the exclusive provider of on-demand, for-hire ground transportation at the Sarasota Bradenton International Airport (the "Airport").[9] SRQ Taxi provided these services under a series of written concession agreements with the Airport's operator, the Airport Authority.[10] The most recent concession agreement (the "Concession Agreement") was entered into in 2009 and expired in 2019.[11]

---

[7] Most of the background for this Memorandum Opinion is taken from *Findings of Fact and Conclusions of Law* entered by Bankruptcy Judge Michael G. Williamson, who presided over the liability phase of trial. Adv. Doc. No. 230. Other portions of the background come from evidence admitted during the damages phase of trial, over which Judge Williamson also presided.

[8] *Findings of Fact & Conclusions of Law*, Adv. Doc. No. 230, at 4.

[9] *Findings of Fact & Conclusions of Law*, Adv. Doc. No. 230, at 3 – 4.

[10] *Findings of Fact & Conclusions of Law*, Adv. Doc. No. 230, at 3 – 4.

[11] SRQ Taxi's Ex. 7, Adv. Doc. No. 191-7. The 2009 Concession Agreement had an initial five-year term, plus a five-year renewal term at the Airport Authority's option.

Under the Concession Agreement, SRQ Taxi was obligated to pay the Airport Authority $.06 for each deplaning passenger at the Airport ("Deplaning Passengers"), regardless of whether Deplaning Passengers needed ground transportation or took an SRQ Taxi.[12]

Like many taxicab companies, rather than providing taxicab services itself, SRQ Taxi used independent contractors.[13] Some of the independent contractors (the "Drivers") were "owner-operators" who owned and were responsible for their own taxicabs ("Owner-Operators"); other independent contractors were "lease drivers" who drove taxicabs owned by SRQ Taxi ("Lease Drivers").[14]

SRQ Taxi did not collect a fare directly from taxicab passengers.[15] Instead, the Drivers paid SRQ Taxi a fixed weekly fee ("Weekly Driver Fee"),[16] with Owner-Operators paying less than Lease Drivers.[17] In addition, the Drivers paid SRQ Taxi "Trip Fees" consisting of a flat per trip "Technology Fee" and a flat per trip "Airport Recovery Fee." SRQ Taxi's revenue was directly related to the number of trips provided by its Drivers.[18]

---

[12] *Findings of Fact & Conclusions of Law*, Adv. Doc. No. 230, at 5.

[13] 9/28/21 Trial Tr., Adv. Doc. No. 383, p. 65, l. 10 – p. 67, l. 4.

[14] 9/28/21 Trial Tr., Adv. Doc. No. 383, p. 45, l. 19 – p. 46, l. 11.

[15] 9/28/21 Trial Tr., Adv. Doc. No. 383, p. 45, l. 19 – p. 46, l. 11.

[16] 9/28/21 Trial Tr., Adv. Doc. No. 383, p. 65, l. 10 – p. 66, l. 1.

[17] 9/28/21 Trial Tr., Adv. Doc. No. 383, p. 65, l. 10 – p. 66, l. 1.

[18] 9/28/21 Trial Tr., Adv. Doc. No. 383, p. 65, l. 10 – p. 67, l. 4.

**A.      The Airport Authority breached the Concession Agreement.**

In 2015, "transportation network companies" ("TNCs"), such as Uber and Lyft, began operating at the Airport.[19] At first, the Airport Authority issued trespass warnings to the TNCs because they were operating without a written agreement or a ground transportation permit.[20] But by the end of 2015, the Airport Authority had entered into written agreements with Uber and Lyft that allowed them to operate at the Airport.[21] Under their agreements with the Airport Authority, Uber and Lyft agreed to pay $2.50 to the Airport Authority for each "pick-up."[22]

Shortly after entering into these agreements, the Airport Authority asked Uber and Lyft to queue off-site. This would give a Deplaning Passenger who needed ground transportation two options:

(1) to walk to the Airport's taxicab stand and immediately be assigned to a SRQ Taxi taxicab; or

(2) to order an Uber or a Lyft on a smart phone application ("app") and wait for the driver to travel from the off-site parking to a pick-up location at the Airport.[23]

---

[19] *Findings of Fact & Conclusions of Law*, Adv. Doc. No. 230, at 8 – 9.

[20] *Findings of Fact & Conclusions of Law*, Adv. Doc. No. 230, at 9.

[21] *Findings of Fact & Conclusions of Law*, Adv. Doc. No. 230, at 9 – 10.

[22] *Findings of Fact & Conclusions of Law*, Adv. Doc. No. 230, at 11.

[23] There is no evidence in the record that Uber or Lyft complied with the Airport Authority's request that they queue off site.

But starting in October 2016, the Airport Authority did three things. First, it designated six reserved parking spaces for Uber and Lyft (and other TNCs) in the Airport's short-term parking lot, located directly in front of the Airport terminal.[24] Second, it installed "Ride Share" signs directing Deplaning Passengers looking for Uber or Lyft to these reserved parking spaces.[25] And third, it increased the time for "free parking" in the Airport's short-term lot from twenty minutes to thirty minutes.[26] One Airport Authority official referred to these accommodations—which made it much more convenient for a Deplaning Passenger to choose an Uber or a Lyft over one of SRQ's taxicabs—as the "red-carpet treatment."[27]

In the six months before the Airport Authority began giving Uber and Lyft the red-carpet treatment, nearly 75% of the Deplaning Passengers using ground transportation ("Pick-ups") utilized a taxicab under agreement with SRQ Taxi.[28] But in the six months after the Airport Authority started Uber and Lyft's red-carpet treatment, SRQ Taxi's share of Pick-ups declined from 75% to 30%; meanwhile, Uber and Lyft's share of Pick-ups increased from roughly 27% to 62%.[29]

---

[24] *Findings of Fact & Conclusions of Law*, Adv. Doc. No. 230, at 12.

[25] *Findings of Fact & Conclusions of Law*, Adv. Doc. No. 230, at 12.

[26] *Findings of Fact & Conclusions of Law*, Adv. Doc. No. 230, at 12.

[27] *Findings of Fact & Conclusions of Law*, Adv. Doc. No. 230, at 12 – 13.

[28] *Findings of Fact & Conclusions of Law*, Adv. Doc. No. 230, at 14.

[29] *Findings of Fact & Conclusions of Law*, Adv. Doc. No. 230, at 14.

Over time, SRQ Taxi's share of the Pick-ups declined even further; as its share and number of Pick-ups went down, SRQ Taxi lost Drivers. And as SRQ Taxi lost Drivers, its revenue declined. Presumably, although it is not clear from the record, SRQ Taxi continued to pay the Airport Authority $.06 per Deplaning Passenger for the more than two million Deplaning Passengers that came through the Airport during the three years after the Airport Authority rolled out the red-carpet treatment for TNCs.

In March 2017, SRQ Taxi sued the Airport Authority in the United States District Court for (among other things) breach of the Concession Agreement. Five months later, SRQ Taxi filed for chapter 11 bankruptcy, and at SRQ Taxi's request, the District Court referred the case to this Court.[30]

After a trial on the issue of liability, Judge Williamson concluded that the Concession Agreement gave SRQ Taxi the exclusive right to provide on-demand, for-hire ground transportation to Deplaning Passengers and that the Airport Authority breached the Concession Agreement by giving Uber and Lyft the red-carpet treatment and effectively allowing TNCs to provide on-demand, for-hire transportation.[31]

---

[30] Adv. Doc. No. 1.

[31] *Findings of Fact & Conclusions of Law*, Adv. Doc. No. 230, at 15 – 38.

The parties then proceeded to the damages phase of the trial. SRQ Taxi initially retained Stuart Goffman and Joseph Chernow as its testifying experts.[32] Goffman, however, became engaged in other matters that prevented him from serving as an expert,[33] and at trial Chernow served as SRQ Taxi's sole testifying expert witness.[34]

### B.    SRQ Taxi's expert witness opines that SRQ Taxi suffered more than $5.5 million in lost profits damages.

SRQ's expert witness, Chernow, has been a licensed Certified Public Accountant for nearly sixty years and is accredited in business valuation by the American Enterprise Institute.[35] Chernow has also been actively involved in the taxicab business for fifty years, including serving as Chief Executive Officer, Chief Financial Officer, and President of Yellow Cab Company of Houston.[36]

Seven months before the damages phase of trial, Chernow submitted an expert report in which he opined that the Airport Authority's breach of the Concession Agreement caused SRQ Taxi $4,117,560 in damages.[37] The damages consisted of $2,414,544 in lost profits from October 2016 through August 2019 (the "Breach

---

[32] Adv. Doc. No. 270; 9/28/21 Trial Tr., Adv. Doc. No. 383, p. 12, ll. 8 – 11.

[33] 9/28/21 Trial Tr., Adv. Doc. No. 383, p. 12, ll. 8 – 11.

[34] 9/28/21 Trial Tr., Adv. Doc. No. 383, p. 12, ll. 8 – 11.

[35] Adv. Doc. No. 324, Ex. A at 1 - 3.

[36] Adv. Doc. No. 324, Ex. A at 1 – 3.

[37] Adv. Doc. No. 324, Ex. A at 3.

Period"),[38] and, on the assumption that SRQ Taxi and the Airport Authority would have entered into continued extensions of the Concession, $1.9 million as the discounted present value of future lost profits after August 2019.[39]

### 1. SRQ Taxi's expert calculated lost profits during the Breach Period based on the decrease in Weekly Driver Fees.

Because SRQ Taxi derives its revenue—and therefore its profits—from the weekly fees paid by its Drivers, Chernow calculated the lost profits from fees SRQ Taxi would have earned had the Airport Authority not given TNCs the red-carpet treatment.

First, he estimated the number of monthly taxi trips that SRQ Taxi lost because of the red-carpet treatment. During the seven months before the Airport Authority rolled out the red-carpet treatment (the "Base Period"), there were 330,292 Deplaning Passengers at the Airport and SRQ Taxi's Drivers provided 18,734 trips ("Taxi Trips"), i.e., an average of 5.7% of Deplaning Passengers took Taxi Trips.[40] During the Breach Period, there were more than two million Deplaning Passengers, and Chernow applied this same 5.7% to that number.[41] Chernow opined that, but for the red-carpet treatment provided to TNCs by the Airport Authority, SRQ Taxi's

---

[38] Adv. Doc. No. 324, Ex. A at 3.

[39] Adv. Doc. No. 324, Ex. A at 3.

[40] Adv. Doc. No. 324, Ex. A at 4 & Ex. 5.

[41] Adv. Doc. No. 324, Ex. A at Ex. 5.

Drivers would have provided 116,213 Taxi Trips to Deplaning Passengers during the Breach Period.

But during the Breach Period, SRQ Taxi Drivers provided only 51,464 Taxi Trips, i.e., 64,749 fewer Taxi Trips than Chernow estimated that, but for the Airport Authority's breach of the Concession Agreement, the Drivers would have provided.[42] Thus, Chernow opined that, during the 35 months of the Breach Period, SRQ Taxi lost an average of 1,850 trips per month (the "Lost Monthly Trips").[43]

Chernow next opined that SRQ Taxi's average Driver drove 63 Taxi Trips per month ("Average Monthly Trips Per Driver") and opined that SRQ Taxi would have needed an additional 29 drivers per month (the "Lost Drivers") to handle the 1,850 Lost Monthly Trips.[44] And Chernow assumed, consistent with the Base Period, that 53% of the monthly Lost Drivers would have been Owner-Operators and 47% would have been Lease Drivers;[45] in other words, 15 of the Lost Drivers would have been Owner-Operators and 14 would have been Lease Drivers.[46]

Next Chernow opined that reasonable Weekly Driver Fees were $400 per week for Owner-Operators and $650 per week for Lease Drivers. He then calculated

---

[42] Adv. Doc. No. 324, Ex. A at Ex. 5.

[43] Adv. Doc. No. 324, Ex. A at 4 & Ex. 5

[44] Adv. Doc. No. 324, Ex. A at 4 & Exs. 4 & 6.

[45] Adv. Doc. No. 324, Ex. A at 4 & Ex. 6.

[46] Adv. Doc. No. 324, Ex. A at Ex. 6.

SRQ's lost monthly gross revenue during the Breach Period by multiplying 15 Owner-Operators x $400 ($6,000) and the 14 Lease Drivers x $650 ($9,100) for a total of $15,100, and then multiplying $15,100 by the average number of weeks in a month (4.35) to arrive at SRQ Taxi's gross lost monthly revenue from Driver Fees: $65,685.[47]

Chernow then accounted for SRQ Taxi's monthly cost savings for insurance, maintenance, and permits on the 14 Lease Drivers, which he estimated at $505 per Lease Driver per month, multiplied 14 x $505 ($7,070), and subtracted that from the $65,685, resulting in net lost monthly revenue of $58,615. Next Chernow multiplied the $58,615 by the 35 months of the Breach Period and concluded that SRQ Taxi suffered a little more than $2 million in lost profits from Driver Fees (the "Lost Profits from Driver Fees") during the Breach Period.[48]

Chernow also calculated lost profits from the Trip Fees.[49] He opined that, over the course of the 35-month Breach Period, SRQ Taxi would have generated an additional $194,248 in Technology Fees and $194,248 in Airport Recovery Fees (the "Lost Profits from Trip Fees").[50] Adding the Lost Profits from Trip Fees to the Lost Profits from Driver Fees, Chernow opined that SRQ Taxi suffered roughly $2.4

---

[47] Adv. Doc. No. 324, Ex. A at 5.

[48] Adv. Doc. No. 324, Ex. A at 5 & Ex. 4.

[49] Adv. Doc. No. 324, Ex. A at 5 – 6.

[50] Adv. Doc. No. 324, Ex. A at 6.

million in Total Lost Profits during the Breach Period ("Total Lost Profits During the Breach Period").[51]

### 2. SRQ Taxi's expert calculated future lost profits after the Breach Period based on SRQ Taxi's enterprise value.

Chernow also opined that the Airport Authority's red-carpet treatment of TNCs and its breach of the Concession Agreement resulted in the total loss of SRQ Taxi's business.[52] He opined that although the Concession Agreement expired on August 31, 2019,[53] assuming a potential buyer of SRQ Taxi's business continued to provide quality taxicab service at the Airport, the Airport Authority would have continually renewed the Concession Agreement.[54] So Chernow valued SRQ Taxi's business as of August 31, 2019.[55]

To do so, Chernow projected SRQ Taxi's Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") for Year 1 by using its net income for 2017 and 2018 and annualizing the net income for March 2019.[56] Chernow then used an annual growth rate of 20% (based on the annual increase in the number of

---

[51] Adv. Doc. No. 324, Ex. A at 6 & Ex. 4.

[52] Adv. Doc. No. 324, Ex. A at 6.

[53] Adv. Doc. No. 324, Ex. A at 6. SRQ Taxi and the Airport Authority entered into a series of short-term extensions: the first lasted until December 31, 2019; the next two lasted until March 31, 2020; and the final one lasted until September 2020.

[54] Adv. Doc. No. 324, Ex. A at 6.

[55] Adv. Doc. No. 324, Ex. A at 6.

[56] Adv. Doc. No. 324, Ex. A at 6.

Deplaning Passengers) to project the income for Years 2 – 5.[57] Next, Chernow discounted SRQ Taxi's total future income to its present value using a 21.77% discount rate (the 20-Year T Bill Rate plus a 20% risk factor) (the "Present Value of 5-Year Cash Flow").[58]

Based on his experience in buying and selling taxicab companies and, in particular, his 1986 sale of Yellow Cab of Houston, Chernow applied a 6x multiple to the Present Value of 5-Year Cash Flow, then discounted that amount to present value, to arrive at a Present Value of Terminal Value, which he calculated to be roughly $3.1 million.[59]

### C. The Airport Authority's *Daubert* Motion.

Two months before trial, the Airport Authority filed a *Daubert* motion directed to Chernow's expert testimony.[60] The Airport Authority did not challenge Chernow's qualifications, but it did challenge the reliability of his opinion.

With respect to the lost profits during the Breach Period, the Airport Authority contends Chernow's methodology was flawed:

- In assuming that SRQ Taxi would have maintained 5.7% of the rides by Deplaning Passengers during the Breach Period, Chernow failed to account for market competition from TNCs;

---

[57] Adv. Doc. No. 324, Ex. A at 6 & Ex. 7.

[58] Adv. Doc. No. 324, Ex. A at 6 & Ex. 7.

[59] Adv. Doc. No. 324, Ex. A at 6 & Ex. 7.

[60] Adv. Doc. No. 324.

- There were no facts or data supporting Chernow's assumption that the average number of trips per Driver was 63;

- There were no facts or data to support Chernow's assumption that Owner-Operators were paying $400/week and that Lease Drivers were paying $650/week;

- In calculating the Lost Profits from Driver Fees, Chernow failed to account for all the incremental costs that SRQ Taxi would have saved from the Lost Monthly Trips; and

- There was no evidence SRQ Taxi Drivers paid a $3 per trip Technology Fee.[61]

And with respect to the post-Breach Period lost profits, the Airport Authority contends that Chernow's opinion was speculative because it was premised on the unreasonable assumption that the Concession Agreement would be renewed continuously.[62]

Judge Williamson denied the *Daubert* Motion without prejudice, subject to renewal after the parties' experts testified at trial.[63]

---

[61] Adv. Doc. No. 324 at 7 – 14.

[62] Adv. Doc. No. 324 at 15 – 17.

[63] Adv. Doc. No. 341.

**D.      SRQ Taxi's expert belatedly supplements his expert report.**

Just days before trial, Chernow submitted a supplemental expert report (the "Supplemental Report").[64] In the Supplemental Report, Chernow reduced SRQ Taxi's total damages from roughly $5.4 million to $4.1 million.[65]

Conceptually, Chernow's methodology remained the same. But, with respect to his lost profits during the Breach Period, Chernow assumed that the average driver would make 71 Taxi Trips per month rather than 63 Taxi Trips per month, which reduced SRQ Taxi's lost profits during the Breach Period by roughly $200,000.[66] And with respect to future lost profits, Chernow adjusted his EBITDA projection to account for the impact of the COVID-19 virus on the number of Deplaning Passengers starting in March 2020, which decreased SRQ Taxi's lost profits by roughly $1.2 million.

Because Chernow's supplemental report was untimely, Judge Williamson limited Chernow's testimony to the opinions expressed in his initial report.[67] At the

---

[64] SRQ Taxi Ex. 1, Adv. Doc. No. 374-1.

[65] SRQ Taxi Ex. 1, Adv. Doc. No. 374-1 at 4.

[66] Because SRQ Taxi's revenue primarily came from weekly fees paid by its Drivers, the fewer Drivers it had, the less revenue it would have earned. By increasing the average number of trips per Driver, Chernow reduced the number of Drivers needed to cover the Lost Trips, and reduced SRQ Taxi's asserted lost profits.

[67] 9/28/21 Trial Tr., Adv. Doc. No. 383, p. 40, l. 10 – p. 43, l. 14.

conclusion of trial, Judge Williamson took SRQ Taxi's damages claim—and the

Airport Authority's *Daubert* motion—under advisement.[68]

## II.    ANALYSIS

The admissibility of expert testimony is governed by Federal Rule of Evidence

702.[69] Under Rule 702, a witness qualified as an expert by knowledge, skill,

experience, training, or education may give opinion testimony if four criteria are

met:

- The opinion testimony will help the trier of fact to understand or to determine a fact in issue;

- The testimony is based on sufficient facts or data;

- The testimony is the product of reliable principles and methods; and

- The expert has reliably applied the principles and methods to the facts of the case.[70]

The proponent of expert testimony bears the burden of proving the testimony

satisfies Rule 702.[71]

---

[68] 9/28/21 Trial Tr., Adv. Doc. No. 383, p. 197, l. 10 – p. 201, l. 7.

[69] *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) ("The admission of expert evidence is governed by Federal Rule of Evidence 702, as explained by *Daubert* and its progeny").

[70] Fed. R. Evid. 702; *Knepfle v. J-Tech Corp.*, 48 F.4th 1282, 1293 – 94 (11th Cir. 2022).

[71] *Rink*, 400 F.3d at 1291 – 92; *Broussard v. Maples*, 535 F. App'x 825, 827 (11th Cir. 2013) (explaining that "[t]he plaintiffs, however, bore the burden of establishing the reliability of its expert's report").

Here, there is no dispute that Chernow is qualified as an expert by his knowledge, skill, experience, training, or education. Rather, the admissibility of Chernow's expert testimony primarily turns on whether his testimony is reliable. As the Supreme Court explained in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, this Court is duty-bound to act as a gatekeeper and ensure that expert testimony is reliable.[72]

Determining whether an expert's opinion is reliable requires a "thorough inquiry."[73] In *Daubert*, the Supreme Court identified four factors courts could consider in determining the reliability of an expert's opinion: (1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community.[74]

The list of *Daubert* factors, however, was not intended to be exhaustive.[75] "Sometimes the specific *Daubert* factors will aid in determining reliability; sometimes other questions may be more useful."[76] For that reason, trial courts are given

---

[72] 509 U.S. 579, 589 & n.7 (1993); *Knepfle*, 48 F.4th at 1293 ("In federal trials, district courts must act as 'gatekeep[ers]' to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'").

[73] *Knepfle*, 48 F.4th at 1294 ("[R]eliability, the second factor, requires a more thorough inquiry.").

[74] *Daubert*, 509 U.S. at 593 – 94.

[75] *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004).

[76] *Id.*

"considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."[77] Here, the Court concludes that Chernow's testimony is not reliable.

### A.    Chernow's expert testimony regarding SRQ Taxi's Total Lost Profits During the Breach Period is unreliable because it is not based on sufficient facts or data.

Chernow's opinion regarding Total Lost Profits During the Breach Period depends, in large part, on the Lost Profits from Driver Fees, which, in turn, depends on the number of Lost Drivers. The number of Lost Drivers, in turn, depends on the number of Lost Monthly Trips, the Average Monthly Trips Per Driver, and the Weekly Driver Fees. Thus, if Chernow's opinion regarding the number of Lost Monthly Trips, the Average Monthly Trips Per Driver, or the Weekly Driver Fees is unreliable, then his entire opinion regarding the Lost Profits from Driver Fees is unreliable.

As set forth below, the Court concludes Chernow's opinions regarding the Lost Monthly Trips, the Average Monthly Trips Per Driver, and Weekly Driver Fees are unreliable, and because they are unreliable, Chernow's opinion on the amount of SQR Taxi's Lost Profits is not admissible under *Daubert.* And even if the Court were to allow Chernow to testify regarding his revised opinion as set forth in the Supplemental Report—and the corresponding reduction in the Lost Profits from

---

[77] *Williams v. Mosaic Fertilizer, LLC,* 889 F.3d 1239, 1245 (11th Cir. 2018) (quoting *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999)).

Driver Fees—the Court would still conclude that Chernow's opinion of the Total Lost Profits During the Breach Period is unreliable because it is not based on sufficient facts or data.

## 1. Chernow's opinion regarding the Lost Monthly Trips is not based on sufficient facts or data.

Chernow's opinion that SRQ Taxi lost 1,850 taxi trips per month is based on his assumption that SRQ Taxi would have provided taxi rides to 5.7% of the Deplaning Passengers during the 35-month Breach Period. He arrived at the 5.7% by looking at the Base Period—the seven months before the Breach Period.

The Court concludes the 5.7% figure is unreliable because it is based on Chernow's opinion that market competition by Uber and Lyft would not have negatively affected the percentage of Deplaning Passengers using SRQ taxicabs. That opinion is not supported by sufficient facts or data.

SRQ Taxi conceded that its Concession Agreement with the Airport Authority did not preclude TNCs from operating at the Airport (allowing Deplaning Passengers to order a TNC such as Uber and Lyft so long as the TNCs queued off Airport property), but that the Airport Authority was precluded from giving TNCs the red-carpet treatment.[78] And, Chernow attributed every single lost taxi trip during the Breach Period to the red-carpet treatment.

---

[78] *Findings of Fact & Conclusions of Law*, Adv. Doc. No. 230, at 32.

But Chernow acknowledged that during the relevant time period, it was well known that traditional taxicabs were losing market share to TNCs nationwide.[79] And this was true at the Airport.[80]

According to Chernow, transportation customers are attracted to TNCs for three reasons: (1) TNC fares are roughly 60% cheaper than taxis; (2) generally, after a passenger calls for a taxicab, it can take the cab driver 30 minutes to an hour to show up (if they even show up at all), whereas TNCs arrive in five to ten minutes, and passengers can track the TNCs' location and progress by using the app on their smart phones; and (3) TNC cars are newer and cleanlier than taxicabs, and TNC drivers are neater and cleanlier than taxicab drivers.[81]

In Chernow's opinion, reliability and appearance were not relevant to the Airport's Deplaning Passengers because (a) taxicabs were waiting at the terminal; (b) SRQ's taxicabs were newer (an average of five years old) and mostly consisted of luxury sedans and SUVs; and (c) SRQ Taxi drivers wore uniforms (blue shirts with the company logo, long black pants, and hard-soled shoes) and were required to pass a background check.[82]

---

[79] Adv. Doc. No. 324, Ex. A at 7; 9/28/21 Trial Tr., Adv. Doc. No. 383, p. 75, ll. 5 – 8.

[80] Adv. Doc. No. 324, Ex. A at 7.

[81] Adv. Doc. No. 324, Ex. A at 8; 9/28/21 Trial Tr., Adv. Doc. No. 383, p. 57, l. 18 – p. 61, l. 18.

[82] Adv. Doc. No. 324, Ex. A at 8.

Chernow opined that the only reason that a Deplaning Passenger would select a TNC over an SRQ taxicab was the lower cost.[83] And Chernow opined that if it were less convenient for a Deplaning Passenger to take Uber or Lyft (e.g., the Deplaning Passenger had to wait for an Uber or Lyft to travel from its off-site parking), "the cheaper fare alone would definitely not have had the impact upon SRQ Taxi trips as actually occurred when the airport gave the TNCs the 'Red-Carpet treatment.'"[84]

But Chernow conceded at trial that he had not reviewed any statistical analysis of the actual effect TNCs have had on the taxicab industry nationally.[85] Nor had Chernow reviewed any statistical analysis of the impact of TNCs on taxicabs at other airports in Florida other than Sarasota Bradenton Airport.[86] More important, Chernow could not recall a specific study regarding customers' preference for TNCs over taxicabs, and he had not conducted any such study himself.[87]

The closest Chernow came to identifying any facts or data he relied on was stating in his report that he "[got] and read a Google News Alert every day with news about Uber/Lyft."[88] At trial, Chernow clarified that the Google News Alerts

---

[83] Adv. Doc. No. 324, Ex. A at 8.

[84] Adv. Doc. No. 324, Ex. A at 9.

[85] 9/28/21 Trial Tr., Adv. Doc. No. 383, p. 78, ll. 4 – 8.

[86] 9/28/21 Trial Tr., Adv. Doc. No. 383, p. 78, ll. 9 – 19.

[87] 9/28/21 Trial Tr., Adv. Doc. No. 383, p. 82, ll. 8 – 16; p. 83, ll. 2 – 6.

[88] Adv. Doc. No. 324, Ex. A at 8.

included links to analytic reports, which "might" have included formal surveys or studies."[89] Yet, nowhere in his expert report did Chernow identify a single Google News Alert that he relied on in forming his opinion.[90]

Chernow also appears to base his opinion of the reasons customers prefer TNCs over taxicabs—and why they did not apply to the Deplaning Passengers—on his experience in the taxicab industry. As Chernow points out, from 1969 to 2005, he was the CEO and CFO of several large taxicab companies with concession agreements at major airports.[91] And for eight years after that, Chernow served as a consultant to taxicab companies.[92] But, as Chernow conceded at trial, the vast amount of his experience was before the advent of TNCs.[93]

Chernow's opinion that the reasons customers prefer TNCs were not relevant to Deplaning Passengers (i.e., why he did not consider market competition in projecting SRQ Taxi's share of trips during the Breach Period) is *ipse dixit*: market competition did not have an impact on SRQ Taxi's share of taxicab trips at the Airport because Chernow says so.

---

[89] 9/28/21 Trial Tr., Adv. Doc. No. 383, p. 134, l. 1 – p. 135, l. 10.

[90] Adv. Doc. No. 324, Ex. A at Ex. 3; 9/28/21 Trial Tr., p. 134, l. 1 – p. 135, l. 14.

[91] Adv. Doc. No. 324, Ex. A at 2 & 8.

[92] Adv. Doc. No. 324, Ex. A at 2 & 8.

[93] 9/28/21 Trial Tr., Adv. Doc. No. 324, p. 72, ll. 5 – 10.

Here, Chernow should have considered the effect market competition had on SRQ Taxi's share of trips during the Breach Period. Because Chernow did not consider market competition, his opinion that SRQ Taxi should have gotten rides from 5.7% of Deplaning Passengers during the Breach Period is not based on sufficient facts or data.[94]

### 2. Chernow's opinion regarding the Lost Drivers is not based on sufficient facts or data.

Chernow's opinion regarding the Lost Drivers is more problematic because it is predicated on the Average Monthly Trips Per Driver.[95] In his initial report, Chernow assumed that the Average Monthly Trips Per Driver was 63. Chernow testified that he obtained that number from a report prepared by Stuart Goffman, one of SRQ Taxi's original testifying experts.[96]

At trial, however, Chernow conceded that he could not determine how Goffman came up with the Average Monthly Trips Per Driver:

> I was criticized by the [the Airport Authority]'s experts, perhaps appropriately, that I had not given enough explanation as to the work I did, so I contacted Mr. Goffman through Mr. Houston's help, and I asked him: "Where did these numbers come from, Stu, and can you get me the way you calculated it?"

---

[94] *Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1022, 1030 – 31 (D. Kan. 2006) (striking expert testimony because, among other reasons, expert "attribute[d] all lost profits to defendants without considering increased competition in the market, other market conditions or alleged wrongdoing of other competitor"); *see also First Sav. Bank, F.S.B. v. U.S. Bancorp*, 117 F. Supp. 2d 1078, 1085 (D. Kan. 2000) (finding expert testimony was "inherently unreliable and purely speculative" because it attributed all plaintiff's losses to defendants' illegal acts even though other factors were present).

[95] Adv. Doc. No. 324, Ex. A at 8.

[96] 9/28/21 Trial Tr., Adv. Doc. No. 383, p. 37, l. 19 – p. 42, p. 11.

> Well, it turned out that the basis that Mr. Goffman used initially couldn't be located.[97]

In other words, in arriving at his opinion on the Average Trips Per Driver, Chernow relied on data given to him by Goffman without verifying that data. [98]

In fairness, Chernow attempted to calculate the Average Monthly Trips Per Driver himself. He came up with 71, which reduced SRQ Taxi's Lost Profits from Driver Fees.[99] But the new Average Monthly Trips Per Driver was disclosed for the first time when Chernow submitted his Supplemental Report just days before the trial on damages.[100] Because the Supplemental Report was untimely, the Airport Authority objected to Chernow's testifying to the revised opinions contained in it.[101] Judge Williamson sustained the objection.[102] Thus, as the record stands, there are no

---

[97] 9/28/21 Trial Tr., Adv. Doc. No. 383, p. 42, ll. 4 – 11.

[98] *Rowe Ent., Inc. v. William Morris Agency, Inc.*, 2003 WL 22124991, at *3 (S.D.N.Y. Sept. 15, 2003) (explaining that "any expert should be aware that a party and counsel in a litigation have an interest in the outcome and that an expert study should not be dependent on the information they supply"); *Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*, 2001 WL 1602976, *4 (S.D.N.Y. Dec. 14, 2001) (dismissing "[a]ssumptions based on conclusory statements of the expert's client, rather than on the expert's independent evaluation" as unreasonable).

[99] SRQ Taxi Ex. 1, Adv. Doc. No. 374-1 at 4 & Ex. 5.

[100] 9/28/21 Trial Tr., Adv. Doc. No. 383, p. 40, l. 10 – p. 43, l. 2.

[101] 9/28/21 Trial Tr., Adv. Doc. No. 383, p. 40, l. 10 – p. 43, l. 2.

[102] 9/28/21 Trial Tr., Adv. Doc. No. 383, p. 40, l. 10 – p. 43, l. 14.

facts or data underlying Chernow's assumption that the Average Monthly Trips Per Driver was 63.[103]

The Court notes that even if Judge Williamson had permitted Chernow to testify regarding the Supplemental Report and his updated estimate of 71 Average Monthly Trips Per Driver were found to be supported by sufficient facts or data, this single opinion would not outweigh the other deficiencies in Chernow's opinion on damages.

### 3. Chernow's opinion regarding the Lost Profits from Driver Fees is unreliable.

Chernow's opinion regarding the Lost Profits from Driver Fees is predicated on his opinion that $400 and $650 Weekly Driver Fees were reasonable fees. But there is no evidence in the record of the actual amount of Weekly Driver Fees paid by Drivers to SRQ Taxi. And Chernow did not base his opinion of the reasonableness of the $400 and $650 Weekly Driver Fees on facts or data, such as a survey of similarly situated airports.

Chernow's opinion of the reasonableness of the Driver Fees is classic *ipse dixit*: Chernow, based on his years in the taxicab industry, opines on the reasonableness of

---

[103] *Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1022, 1030 (D. Kan. 2006) (striking testimony of expert who "did not independently analyze [plaintiff's sales] projections, and plaintiff provide[d] no coherent explanation how it arrived at the projections").

the Weekly Driver Fees. But "the simple *ipse dixit* of the expert is not enough."[104] In order for the opinion to be tested, it must be supported by facts or data.

### B.    Chernow's opinion regarding SRQ Taxi's future lost profits is unreliable.

Chernow calculated SRQ Taxi's future lost profits claim by performing a "business valuation" based on SRQ Taxi's "enterprise value."[105] Judge Williamson previously ruled—and this Court concurs—that SRQ Taxi "may not claim lost market value as the measure of damages."[106] Rather, Judge Williamson limited SRQ Taxi to claiming lost profits.[107] If the Court assumes that "lost enterprise value" is Chernow's terminology for "lost future profits reduced to present value" as he testified, Chernow's testimony is nonetheless inadmissible because it is unreliable for two reasons: (1) Chernow assumes that the Concession Agreement would be continually renewed; and (2) Chernow did not base his 6x multiplier on sufficient facts or data.

### 1.    No evidence that the Airport Authority would have renewed the Concession Agreement.

The key to Chernow's "lost enterprise value" opinion is that the Concession Agreement, which expired in August 2019, would be renewed continually on

---

[104] *In re J.C. Householder Land Trust #1*, 501 B.R. 441, 454 (Bankr. M.D. Fla. 2013) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 157)).

[105] 9/28/21 Trial Tr., Adv. Doc. No. 383, p. 34, ll. 4 – 21.

[106] Adv. Doc. No. 317, ¶ 3.

[107] Adv. Doc. No. 317, ¶ 3.

essentially the same terms. In particular, Chernow opined that "[t]he reasonable expectation of any buyer would be that as long as quality service was provided by the taxi company, the concession would be continually renewed."[108]

But Chernow did not review any studies or surveys regarding renewal of taxicab concession agreements at airports;[109] he did not perform any analysis of the taxi concession agreement renewals;[110] and he did not consider the Airport Authority's possible unwillingness to renew the Consulting Agreement in light of the impact of TNCs on the taxicab industry.

Instead, Chernow pointed to two examples as the basis for his opinion that airports continually renew taxicab concession agreements:

First, the concession agreement between George H.W. Bush Airport in Houston, Texas, and Yellow Cab Company of Houston, which Chernow served as the President, CEO, and CFO of for more than two decades.[111] Chernow testified that he believed that concession agreement, which was initially for ten years with a ten-year extension, was initially entered into in 1967 and renewed continually through 2005.[112]

---

[108] Adv. Doc. No. 324, Ex. A at 6.

[109] Adv. Doc. No. 326, p. 88, ll. 1 – 4.

[110] Adv. Doc. No. 326, p. 87, ll. 19 – 25.

[111] 9/28/21 Trial Tr., Adv. Doc. No. 383, p. 53, l. 17 – 55, l. 9.

[112] 9/28/21 Trial Tr., Adv. Doc. No. 383, p. 53, l. 17 – 55, l. 9.

Second, a concession agreement between Golden State Transit, d/b/a Yellow Cab, and the City of Los Angeles.[113] Chernow served as an expert witness in a lawsuit between Golden State and the City of Los Angeles in 1991.[114] The City of Los Angeles, the defendant in that lawsuit, apparently argued it had no obligation to renew Golden State's five-year taxicab franchise.[115] Chernow testified that, while the City of Los Angeles may have had no obligation to renew taxicab franchises, the facts showed that the City of Los Angeles routinely did so for all cab companies in Los Angeles.[116]

The Court concludes these two examples are insufficient facts or data to support Chernow's expert opinion for two reasons.

First, both examples predate the advent of TNCs. In fact, most of Chernow's own experience predates the advent of TNCs. Chernow does not point to a single example of a concession agreement being continually renewed on essentially the same terms after the advent of TNCs.[117]

Second, Chernow fails to consider a Florida law that went into effect in 2017.[118] That law mandates that any pick-up fees charged to TNCs—such as the

---

[113] 9/28/21 Trial Tr., Adv. Doc. No. 383, p. 53, l. 17 – 55, l. 9.

[114] 9/28/21 Trial Tr., Adv. Doc. No. 383, p. 53, l. 17 – 55, l. 9.

[115] 9/28/21 Trial Tr., Adv. Doc. No. 383, p. 53, l. 17 – 55, l. 9.

[116] 9/28/21 Trial Tr., Adv. Doc. No. 383, p. 53, l. 17 – 55, l. 9.

[117] 9/28/21 Trial Tr., Adv. Doc. No. 383, p. 72, ll. 5 – 10.

[118] § 627.748, Fla. Stat. (2017).

$2.50 per pick-up that the Airport Authority started charging TNCs in 2015—be

consistent with those charged to taxicabs.[119] If, in fact, the Concession Agreement

were renewed, it is not clear that, in light of the new Florida law, the Concession

Agreement could be renewed on the same terms.

Once again, Chernow's testimony is largely *ipse dixit*: the Concession

Agreement would be continually renewed because he says it would. But, as

explained above, "[t]he simple *ipse dixit* of the expert is not enough."[120]

**2.     Chernow's 6x multiple of EBITDA is not based on sufficient facts or data.**

Chernow testified that he calculated SRQ Taxi's enterprise value by applying a

6x multiple to its EBITDA. He justified his use of the 6x multiple on his years of

experience in buying and selling taxicab companies and his sale of Yellow Cab of

Houston. But that sale (a) took place in 1986, more than 30 years before the 2019

termination of the Concession Agreement here and long before the advent of TNCs

and their impact on the taxi industry; (b) was in Houston, Texas, a major

metropolitan area, and very different from the Sarasota, Florida market; and (c)

involved a concession agreement with the George H.W. Bush Airport, a major

international airport, far different from the Airport here. In reaching his opinion,

---

[119] § 627.748(17), Fla. Stat.

[120] *In re J.C. Householder Land Trust #1*, 501 B.R. 441, 454 (Bankr. M.D. Fla. 2013) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 157)).

Chernow did not rely on facts or data regarding the multiples used in current sales of taxicab companies in market areas similar to Sarasota, Florida.

Chernow's opinion regarding his use of the 6x multiple is, again, *ipse dixit* and is inadmissible.

## III.    CONCLUSION

Although determining the reliability of expert witness testimony is a case-specific inquiry, the trial court must, in each case, determine that expert testimony is reliable before it can be admitted:

> Exactly *how* reliability is evaluated may vary from case to case, but what remains constant is the requirement that the trial judge evaluate the reliability of the testimony before allowing its admission at trial.[121]

Chernow's opinion here is like the expert opinion excluded in *Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*:

> [The expert's] methodology is a house of cards. It may be mathematically accurate, but [the expert] has not shown that it is sound or reliable.[122]

Like the expert's damages calculations in *Sunlight Saunas*, Chernow's damages calculations here are legally unreliable and therefore inadmissible under Rule 702.

---

[121] *United States v. Frazier*, 387 F.3d 1244, 1262 (11th Cir. 2004).

[122] *Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 427 F. Supp. 2d 1022, 1031 (D. Kan. 2006).

Accordingly, it is

**ORDERED**:

1.      The Airport Authority's *Daubert* motion[123] is GRANTED.

2.      Joseph Chernow's expert testimony does not meet the requirements of

Federal Rule of Evidence 702 and is therefore inadmissible.

---

| Clerk's Office to serve interested parties via CM/ECF. |
| --- |

Charles F. Ketchey, Jr., Esq.
William A. McBride, Esq.
Trenam Kemker
*Co-Counsel for Defendant*

M. Lewis Hall, III, Esq.
Williams, Parker, Harrison, Dietz & Getzen
*Co-Counsel for Defendant*

Edward J. Peterson, III, Esq.
Stichter, Riedel, Blain & Postler, P.A.
*Counsel for Plaintiff*

---

[123] Adv. Doc. No. 324.